

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-24-00293-CR

Miranda **CASAREZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 186th Judicial District Court, Bexar County, Texas
Trial Court No. 2022CR4915B
Honorable Kristina Escalona, Judge Presiding

Opinion by:     Rebeca C. Martinez, Chief Justice

Sitting:        Rebeca C. Martinez, Chief Justice
                Lori I. Valenzuela, Justice
                Lori Massey Brissette, Justice

Delivered and Filed: June 25, 2025

AFFIRMED

A jury convicted appellant Miranda Casarez on one count of serious bodily injury to a child, *see* TEX. PENAL CODE ANN. § 22.04(a)(1), and it assessed punishment at twenty-five years imprisonment. The trial court signed a final judgment in accordance with the jury's verdict. In one issue, Casarez challenges the legal sufficiency of the evidence supporting her conviction. We affirm.

# I. BACKGROUND

In 2021, Casarez was in a romantic relationship with B.C.S.,[1] and she cared for B.C.S.'s two sons: B.C., who was four years old; and B.C.J., who was nine years old. On August 17, 2021, Casarez found B.C. unresponsive, and she drove him to the Children's Hospital of San Antonio ("CHOSA"). B.C. was pronounced dead in the emergency department, and an autopsy determined that B.C. "most likely died from starvation." Casarez was indicted on one count of serious bodily injury to a child. At trial, the State called B.C.J., Kimberley Molina, M.D., a board-certified forensic pathologist and the chief medical examiner for Bexar County, and James Lukefahr, M.D., a physician board certified in general pediatrics and child abuse pediatrics. Casarez called William R. Anderson, M.D., a physician board certified in anatomic, clinical, and forensic pathology, and Daniel Gebhard, M.D., a board-certified pediatrician with a subspeciality in pediatric critical care.

## A.    B.C.J.

B.C.J. testified that Casarez cared for the children while Father worked during the weekdays. B.C.J. recalled six areas of concern relating to Casarez's feeding and mistreating B.C..

First, B.C.J. recalled that "whenever I was living there, [Casarez] would not feed [B.C.]." B.C.J. elaborated that "at first, she started feeding him because my dad was there. And then later on to that [sic] point where she started not feeding him. She — we — me and [another child] got fed, but [B.C.] didn't. So — so she, like, [did] not fe[e]d him at all." When B.C.'s father was at home, Casarez would feed B.C. or B.C.'s father would bring food home. B.C. would try to get food for himself, but he was "not that great" at it. Casarez locked the refrigerator and cabinets. The only food that was occasionally left out and unlocked was bread. The trial court admitted photographs and videos showing locks on the refrigerator and kitchen cabinets. One of the videos

---

[1] We will use initials to protect the identity of minors.

shows B.C. trying to open the locked refrigerator. If B.C.J. tried giving B.C. some of his food, Casarez would throw B.C.J.'s food in the trash.

The remaining five areas of concern related to Casarez mistreating B.C. In the second area, B.C.J. recalled that Casarez would get mad at B.C. and punish him by spanking him with a belt. Although Casarez aimed to spank B.C.'s butt, she usually missed and hit his back. Third, Casarez would also, according to B.C.J., punish B.C. by, on one occasion, forcing his mouth open and pouring hand sanitizer, and on another occasion, hot sauce into it. B.C. would cry because Casarez's prying hurt him. Afterwards, Casarez would scoop a cup of water from the toilet and give it to B.C. Casarez did this even if the toilet water also contained urine. Fourth, Casarez would wipe the children's Crocs with bread and feed B.C. the soiled bread. B.C. "ate it all" because he was hungry. Fifth, every "once in a while" when Casarez was mad at B.C., she would do a "flip-flop" on him. B.C.J. described a "flip-flop" as "[Casarez] would grab [B.C.] and throw him up into the air and make sure he falls down to the ground, and it would — it would hurt [B.C.], and he would cry." Sixth, Casarez gave B.C. sleeping pills at night. Casarez told B.C.J. to keep what she did to B.C. a secret.

## B.     Dr. Molina – Direct Examination

Dr. Molina's investigation into B.C.'s death included an autopsy that she performed and a review of B.C.'s medical records. Dr. Molina's autopsy report, which the trial court admitted into evidence, notes that there were four indicators that pointed to starvation as the cause of B.C.'s death. First, B.C. was markedly underweight and had a "precipitous decrease in body weight two months prior to death." Second, B.C. had a clinical history of low total protein and albumin. Dr. Molina explained that albumin is a protein that the body needs, and it is created from food and other proteins in the body. Third, B.C. had a "paucity of abdominal adipose tissue." Fourth, Dr.

Molina's autopsy report notes that her "investigation reveals intentional deprivation of food by caregiver." Dr. Molina came to this conclusion after reviewing surveillance video from B.C.'s home and videos that Casarez made of B.C. pleading for bread.

Dr. Molina considered type–1 diabetes as a possible cause, but no evidence supported that possibility. Type–1 diabetes causes death through diabetic ketoacidosis. Diabetic ketoacidosis in turn causes blood sugar levels to rise "very, very high," and it causes the body to create ketones, which are acids. Autopsy test results revealed that B.C.'s glucose was normal[2] and that there were no ketones. Additionally, diabetes causes changes in the kidneys that can be visualized, and B.C.'s kidneys did not exhibit such changes. Thirdly, type–1 diabetes is caused when a person's pancreas lacks islet cells, which make insulin. Dr. Molina examined B.C.'s pancreas cells under a microscope, and she saw islet cells.

## C.  Dr. Lukefahr

Dr. Lukefahr concluded, as Dr. Molina did, that B.C. died of starvation. He based his conclusion on three indicators. First, Dr. Lukefahr observed that for B.C.'s first four years, he was growing well within the normal range of other male children. Then,

> pretty abruptly after [B.C.'s] fourth birthday, his weight started declining. And it declined steadily over the course of about the next ten months. And then in a little before his fifth birthday, all of [a] sudden[,] there was this very, very rapid decline leading to the point where he died.

Second, Dr. Lukefahr noted that starvation causes a "peach fuzz" type of hair to appear on the body, including the trunk and extremities. This hair is called "lanugo." A photograph of B.C.'s backside taken after he passed in the emergency department shows hair growth that, according to Dr. Lukefahr, is consistent with lanugo. Third, B.C. had very little food content in his intestinal

---

[2] Dr. Molina acknowledged that B.C. had two high glucose results as he received emergency medical care. She attributed these to the stress of the dying process. Such readings are why an autopsy measures glucose levels through vitreous — behind the eye — fluid because it tends to be more accurate.

tract. Ordinarily, "just because of meals at regular intervals and so forth, there's evidence of food traversing the intestinal tract kind of all the way along." However, B.C. "had very little content in his intestinal tract."

Dr. Lukefahr excluded two possible causes for B.C.'s weight loss suggested by Casarez. First, Dr. Gebhard suggested that B.C. may have had an autism-type disorder that caused him to be a "picky eater." Dr. Lukefahr testified that he had never seen a "picky eater" starve himself to death. Dr. Lukefahr also testified that the question of whether B.C. had autism is irrelevant to his starving to death because there is no correlation between autism and starvation. Second, Dr. Lukefahr confronted a CHOSA medical record indicating that B.C. had a "finger stick glucose" of 300 when resuscitation efforts were performed on him. He acknowledged that such a figure was "eye-catching" and that there was a possibility that the figure was consistent with diabetes. However, Dr. Lukefahr cautioned that, to cause death, such a glucose level would have had to "been going on for a while." He elaborated that "[t]he nine months that came before those past last few days were not diabetes. Something else was going on. And maybe diabetes was the terminal event."

## D.    Dr. Anderson

Dr. Anderson pointed to three factors to dispute the conclusion that B.C. died of starvation. First, Dr. Anderson noted that "[b]rown fat is a response to long-term deprivation of nutrients in how the body reacts." Dr. Anderson emphasized that Dr. Molina's autopsy report makes no mention of finding any brown fat. Second and third, Dr. Anderson noted that starvation typically causes a "fatty liver" and myocyte loss or heart muscle degradation. However, Dr. Molina detailed that there was "nothing abnormal at all on the liver," and she similarly made no indication of myocyte loss. Dr. Anderson determined that B.C. died from a cerebral edema, or brain swelling.

**E.      Dr. Gebhard**

Dr. Gebhard echoed Dr. Anderson's opinion that a lack of "fatty infiltration of the liver" and myocyte loss pointed against starvation as the cause of death. Dr. Gebhard believed that B.C. suffered from type–1 diabetes and autism. He explained that, in the months leading up to B.C.'s death, his symptoms of excessive thirst, regression back to using diapers after being potty-trained, severe mood disorders, and eating but not gaining weight may be associated with type–1 diabetes. Regarding autism, Dr. Gebhard testified that children with autism may restrict their diet to only specific foods that have a texture that they like. Dr. Gebhard reconciled this characteristic with the evidence that B.C. pleaded for bread. He also reconciled evidence that B.C. picked at his ears and banged his head against the wall as "self-soothing" behaviors associated with autism. Dr. Gebhard specifically noted that banging your head releases endorphins that can make you feel better.

Lastly, Dr. Gebhard did not trust the results from tests done at the CHOSA emergency department on August 17. He explained that when a patient is in cardiac arrest, it is oftentimes difficult to insert an IV line through a vein. In such situations, healthcare providers drill into the patient's bone marrow to access the vascular system and deliver resuscitation medication and fluids. This is called an interosseous or "IO." Saline is used to flush the freshly drilled hole, and it can "flush out what's in there[.]" Laboratory tests are conducted on what is "draw[n] back." According to Dr. Gebhard, laboratory results from such samples "are notoriously awful."

**F.      Dr. Molina – Rebuttal Testimony**

After Dr. Anderson and Dr. Gebhard testified, the State re-called Dr. Molina for rebuttal testimony on three areas. First, Dr. Molina explained that people have two kinds of fat: (1) yellow fat, which is used to store energy for use later; and (2) brown fat, which is used to keep us warm.

A person starving loses both kinds of fat. However, brown fat may appear more apparent in starvation cases. Second, Dr. Molina testified that a fatty liver is not always present in a starvation case. Third, Dr. Molina explained that myocyte loss is essentially the body digesting itself for nourishment. Myocyte loss is typically present with chronic, or long-term, starvation, but it may not necessarily be present in acute starvation. Dr. Molina concluded by opining that B.C. died of acute rather than chronic starvation.

## II. DISCUSSION

### A. Standard of Review

When reviewing the legal sufficiency of the evidence, an appellate court must view the evidence in the light most favorable to the prosecution and ask whether any rational trier of fact could have found each element of the offense beyond a reasonable doubt. *Carter v. State*, 620 S.W.3d 147, 149 (Tex. Crim. App. 2021) (citation omitted). The appellate court must give deference to "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*. (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Circumstantial evidence and direct evidence are equally probative, and either one alone can be sufficient to establish guilt. *Id.* (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Juries are permitted to draw reasonable inferences from the evidence presented at trial "as long as each inference is supported by the evidence presented at trial." *Id*. at 150 (quoting *Hooper*, 214 S.W.3d at 15).

### B. Argument & Analysis

In Casarez's sole issue, she argues that Dr. Molina "had the experience of one prior starvation case," and that her conclusion of starvation was "in direct opposition to the opinions of two highly experienced pediatric-death experts." Casarez essentially argues that, because of their

better credentials, the testimony of Dr. Anderson and Dr. Gebhard outweighs the testimony of Dr. Molina. However, Casarez directs us to no legal authority supporting her argument. *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, *with appropriate citations to authorities* and to the record.") (emphasis added).

Liberally construing Casarez's legal sufficiency challenge in light of the appropriate standard of review, we must ensure that "each inference is supported by the evidence presented at trial." *Carter*, 620 S.W.3d at 150. Together, Dr. Molina and Dr. Lukefahr informed the jury that (1) B.C.'s weight dropped "pretty abruptly" after his fourth birthday; (2) the lanugo on B.C., seen in photographs, is a symptom of starvation; (3) B.C. had a paucity of abdominal adipose tissue; (4) B.C.'s low levels of total protein and albumin signify malnourishment; and (5) B.C. had very little food in his intestinal track. Dr. Molina and Dr. Lukefahr also explained why they disagreed with the alternative causes of B.C.'s death espoused by Dr. Anderson and Dr. Gebhard. This testimony, coupled with B.C.J.'s recollection that "[Casarez] would not feed [B.C.,]" allowed the jury to draw a reasonable inference that Casarez starved B.C. *See id*. While Casarez believes Dr. Anderson's and Dr. Gebhard's opinions that B.C. may have died of type–1 diabetes and/or autism are more compelling, it was within the jury's province to resolve conflicting expert testimony. *See id*.

We overrule Casarez's sole issue.

### III. CONCLUSION

We affirm the trial court's judgment.

Rebeca C. Martinez, Chief Justice

DO NOT PUBLISH